UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.                                              Case No.  6:22-CR-176-CEM-LHP

BRETT AVERY TIPTON,

Defendant.
_____/

## DEFENDANT'S SENTENCING MEMORANDUM

The Defendant, BRETT AVERY TIPTON, by and through his undersigned counsel, respectfully submits this sentencing memorandum for this Honorable Court's consideration.

## STATEMENT OF FACTS

On July 24, 2024, Mr. Tipton pled guilty to Counts One, Four, and Five of the indictment. *See* Docs. 17, 115. Accordingly, Mr. Tipton is facing a mandatory minimum penalty of 15 years. *See* 18 U.S.C §§ 2251(a) and (e). The Presentence Report (PSR) calculates Mr. Tipton's total offense level as a level 43 with a criminal history category of I. PSR at ¶ 135. Thus, Mr. Tipton faces a guideline sentencing range of 960 months. *Id.* at ¶ 135. Based on his significant mental health and medical conditions, Mr. Tipton submits that a sentence of life imprisonment constitutes an unjust result.

## MEMORANDUM OF LAW

This memorandum establishes that a variance is warranted in Mr. Tipton's case pursuant to 18 U.S.C. § 3553, notwithstanding the advisory guideline range. Based on Mr. Tipton's serious medical and mental health conditions, an advisory guideline sentence would constitute a uniquely harsh prison sentence.

### I.   *Booker and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a)*

Pursuant to *United States v. Booker,* 543 U.S. 220, 245-67 (2005), a court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes

mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).  The significance of this perspective, with its emphasis on the individual and the unique circumstances of his case, cannot be overstated in the instant case. Indeed, Mr. Tipton's case should not be reduced to a rigid sentencing matrix. Placing Mr. Tipton's narrative within the statutory framework of § 3553(a) necessarily underscores this tenet.

Although Mr. Tipton comprehends the severity of his conduct, he submits that the imposition of an advisory guideline sentence would necessarily violate the requirement that a defendant's sentence be sufficient but not greater than necessary to satisfy the purposes of § 3553(a). *See Pepper v. United States*, 562 U.S. 476 (2011).

## 1.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mr. Tipton concedes that his crime is serious and his conduct egregious. He acknowledges that his offense conduct reflects both a recurring and ongoing crisis that has caused considerable damage to his victims. Because of his inability to conquer his deviant behavior, he requests that he receive extensive sex offender treatment while in the Federal Bureau of Prisons (BOP).

Despite the acknowledged seriousness of his conduct, the first § 3553 factor is not limited to a mere consideration of a defendant's crime. Instead, a court must also consider a defendant's offense conduct against the backdrop of his

entire life and circumstances. A contrary perspective, which solely focuses on a defendant's crime, would render § 3553 meaningless.

Mr. Tipton is a 42-year-old man whose life has been marked by serious medical and mental health issues. *See* PSR at §§ 111-122. *See also Medical Report of Dr. Olga Emgushov,* attached hereto as Exhibit 1, at p. 12.

<u>Medical Conditions</u>

The Defendant's medical condition includes, but is not limited to: a) Uncontrolled Type 2 Diabetes Mellitus; b) High Blood Pressure; c) Cerebral Infarct (stroke); d) Recurrent Foot Wounds and Infections; e) Osteomyelitis; f) Diabetic Neuropathy; g) Multiple Gastrointestinal Issues; h) History of Mesenteric Panniculitis (rare); i) Stage 2 Kidney Disease; j) Left Ventricular Hypertrophy (enlarged heart); and k) Diastolic Dysfunction (heart stiffening).

    a.    *Uncontrolled Type 2 Diabetes*

Mr. Tipton was diagnosed with insulin-dependent diabetes at the age of 18 and currently suffers from uncontrolled type 2 diabetes. Ex. 1 at pgs. 4-5. "Diabetes is a chronic health condition that affects how the body turns food into energy . . . Mr. Tipton has the type of diabetes where he can't make all the insulin that his body needs and must inject it multiple times a day." *Id.* at p. 4. Notably, individuals in the United States suffering from type 2 diagnosed at age 30 face a reduction in life expectancy by up to 14 years. *See* Univ. of Cambridge, *Type 2 diabetes at age 30 can reduce life expectancy by up to 14 years* (Oct 3, 2023). Taking the 14-year reduction in life expectancy into account and recognizing that

the life expectancy of white men in the United States is now 73 years, it is not a stretch to assume that Mr. Tipton, at age 42, will die within the next 20 years.

Moreover, Mr. Tipton's long history of diabetes has led to multiple complications.  Dr. Emgushov states:

> Mr. Tipton has had diabetes for 22 years. Diabetic complications usually start appearing after 10 years. Besides increasing his risk of blindness, heart, brain and kidney disease, diabetes has also affected his immune system, and he has decreased ability to fight infections. Mr. Tipton already has some of these complications . . .

Ex. 1 at p. 5.

      *b.*   *High Blood Pressure*

"High blood pressure is a common condition that affects the body's arteries . . . . It's also called hypertension. If you have high blood pressure, the force of the blood pushing against the artery walls is consistently too high. The heart has to work harder to pump blood." *See* Mayo Clinic, *High Blood Pressure (Hypertension)*, *available at* https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410. "High blood pressure quietly damages the body for years before some symptoms arise, but there is evidence that subtle but harmful brain damage from high blood pressure can occur in a few years." Ex. 1 at p. 10. Such harmful brain damage was seen in Mr. Tipton after his acute cerebral infarct (a stroke) on August 24, 2021. *Id.*

      *c.*   *Cerebral Infarct* (*Stroke*)

A cerebral infarct or ischemic stroke "occurs when the blood supply to part of the brain is blocked or reduced. This prevents brain tissue from getting oxygen

and nutrients. Brain cells begin to die in minutes." *See* Mayo Clinic, *Stroke*, *available at* https://www.mayoclinic.org/diseases-conditions/stroke/symptoms-causes/syc-20350113.

The medical records, including an MRI, establish that Mr. Tipton suffered a stroke at the relatively young age of 39. Ex. 1 at 10. Although strokes have traditionally been perceived as a disease of the elderly, "the prevalence of stroke in young adults, defined as age < 50 years, is estimated to be about 10–14% of all strokes." *See* Bukhari, Yaghi & Bashir, Stroke in Young Adults, J. Clin. Med, (Jul 29, 2023), abstract attached hereto as Exhibit 2. Many of these younger victims deal with permanent cognitive deficits, epilepsy, and chronic debilitating fatigue. *Id.* (citations omitted). In Mr. Tipton's case, his early cognitive impairments were impacted and exacerbated by his stroke. *See*, *e.g.*, Schaapsmeerders P., et al, *Long-term cognitive impairment after first-ever ischemic stroke in young adults,* Stroke (2013).

   d.   *Recurrent Foot Wounds and Infections*

"In severe cases, diabetic foot problems can lead to the amputation of a toe, the foot, or part of the leg." *See* WebMD, *Diabetic Foot Problems*, *available at* https://www.webmd.com/diabetes/foot-problems.   "Mr.   Tipton   has   had problems with recurrent foot and leg wounds and infections requiring multiple oral (by mouth) and IV (intravenous) antibiotic therapy since at least 2015." *Id.* at 5.  In February 2021, he was seen in the Emergency Department (ED) before being referred to podiatry and wound care. Ex. 1 at p. 5.  Wound care found eight

different wounds which would require an estimated 14 weeks of care. This estimate was wrong as the treatment lasted 21 months and involved multiple visits to the ED and surgical interventions. *Id*. at 8. During one of the incidents in the 21-month period, the medical records demonstrated the serious nature of his condition and his need for adequate medical care as blood cultures revealed that he had a bacterial infection in his blood and became septic (had a life-threatening infection throughout his blood and body). Ex. 1 at 6.

e. *Osteomyelitis*

As noted above, Dr. Correa diagnosed Mr. Tipton with Osteomyelitis. "Osteomyelitis is an infection in a bone. Infections can reach a bone by traveling through the bloodstream or spreading from nearby tissue. Infections can also begin in the bone itself if an injury exposes the bone to germs." *See* Mayo Clinic*, Osteomyelitis,* available at https://www.mayoclinic.org/diseases-conditions/osteomyelitis/symptoms-causes/syc-20375913.

In diabetics, certain wounds can lead to osteomyelitis. Ex. 1 at 6. "Bone infections require multiple weeks to months of IV antibiotic treatment and, even then, may not heal properly and may eventually require amputation." Ex. 1 at 6.

f. *Diabetic Neuropathy*

Due to his long history of diabetes, Mr. Tipton suffers from diabetic neuropathy, which damages the peripheral nerves. Ex. 1 at 9. His high sugars have harmed these smaller nerves and cause "numbness, pain, and/or weakness in the hands or feet." Id. at 9-10.  Dr. Emgushov notes that his diabetic

neuropathy contributes to his wound problems and requires careful monitoring. *Id.* at 0-10.

### g-h. *Gastrointestinal Issues and Mesentric Panniculitis*

Dr. Emgushov further notes that Mr. Tipton's diabetic neuropathy can affect his autonomic nerves, which control systems in the body which we do not consciously control. *Id.* at 10. Such systems include our digestive system. *Id.* "Problems with the digestive system include gastroparesis, which makes the stomach empty too slowly into the intestines. This delay alters digestion and glucose control and causes nausea and vomiting. Without proper small frequent diabetic meals, it will be hard to control his blood sugar." *Id.*

A significant aspect of Mr. Tipton's fragile medical state is his chronic abdominal issues. Dr. Emgushov asserts that "Mr. Tipton has also had chronic abdominal complaints that started in April 2014, when he was diagnosed with gastroesophageal disease and started on omeprazole." Id. at 11.  In 2016, he was treated in the ED for abdominal pain, and an abdominal CT Scan found mesenteric panniculitis. Mr. Tipton also suffers from Non-Alcoholic Fatty Liver Disease (NAFLD), which was detected in abdominal ultrasound in 2016 and an abdominal CT Scan on April 22, 2022.  Id. at 11. Mr. Tipton's NAFLD can cause liver inflammation and scarring. *Id.*

### i. *Kidney Disease (Stage 2)*

Due to his long-standing diabetes, Mr. Tipton is at risk for kidney disease. Approximately three weeks after he was jailed, Mr. Tipton's kidney blood lab

showed only 71% kidney function at that time. Ex. 1 at 10. His urine also showed elevated glucose (normal urine does not have any glucose). *Id*. The nurse practitioner noted that Mr. Tipton showed some renal insufficiency and decreased kidney function. *Id*. at 10.

j-k.    *Left Ventricular Hypertrophy and Diastolic Dysfunction*

Tipton's high blood pressure has affected his heart. "[H]e has left ventricular hypertrophy (enlarged heart, usually caused by high blood pressure) and diastolic dysfunction (heart stiffening, usually caused by high blood pressure), noted on echocardiograms in August and September 2021." Ex. 1 at 10-11. Left ventricular hypertrophy places Mr. Tipton "at significant risk of developing myocardial ischemia and infarction, heart failure, dysrhythmias, or even sudden death." *See* Bornstein, Rao and Marwaha, *Left Ventricular Hypertrophy*, Nat'l Instit of Health (Aug. 8, 2023).

In turn, "diastolic dysfunction may lead to diastolic heart failure. It also is a leading cause of pulmonary hypertension or high blood pressure in the lungs. It may also be associated with atrial fibrillation." Cleveland Clinic, *Diastolic Dysfunction*, *available at* https://my.clevelandclinic.org/health/diseases/23434-diastolic-dysfunction,

*Mental Health Conditions*

Mr. Tipton's culpability in the instant case is also mitigated by his struggles with mental illness and cognitive deficiencies. Mr. Tipton has a long history of

mental illness and cognitive impairment – conditions that have worsened over time.

Significantly, Mr. Tipton's struggles with mental illness and cognitive impairment began when he was child. As the PSR notes, Mr. Tipton was in special education classes, repeated the 9th grade and dropped out of school in the 11th grade. PSR at ¶ 127. Due to his academic and behavioral struggles, Dr. Robert Lehton performed a psychological evaluation of Mr. Tipton when the latter was 9 years old. *See Report of Dr. Robert Lehton*, attached hereto as Exhibit 3.  Dr. Lehton found that Mr. Tipton possibly had "psycho-motor disorders and processing difficulty in the area of perceptual-motor disorders." Ex. 3 at 6.

In diagnosing Mr. Tipton with Attention Deficit Disorder (ADHD), Dr. Lehton noted that testing reflected that Mr. Tipton displayed a "pattern of concentration disorder that usually have a psychobiological basis." *Id.*  Mr. Tipton's low score on the Bender Gestalt Perceptual Motor Test depicted a "a psycho-motor dysfunction with strong indication of learning disability . . ." *Id.* at 5. Because he was often bullied in school and because of his learning struggles, Mr. Tipton attended approximately 7 different schools before he dropped out. When he turned 22, the Social Security Administration (SSA) determined that Mr. Tipton was disabled based on his medical and mental conditions. Thus, SSA has determined that Mr. Tipton has been impaired for the past 20 years.

Because of Mr. Tipton's long-standing mental illness and his cognitive functioning, Mr. Tipton was evaluated by Dr. Jeffrey Danziger, a psychiatrist, and

Dr. Tracy Henley, a neuropsychologist. Both Dr. Danziger and Dr. Henley found that Mr. Tipton was incompetent to proceed. *See* PSR; *Reports of Dr. Danziger and Dr. Henley*.

Based on his testing and evaluation, Dr. Danziger's initial impression of Mr. Tipton was as follows:

> [T]he defendant presented as an individual suffering from a Major Neurocognitive Disorder/dementia, with significant cognitive deficits. Given that he was noted to have an IQ within the average range as a youth, a diagnosis of Intellectual Disability would not apply. The most plausible etiology for a dementing illness would involve a vascular dementia, given the defendant's history of insulin dependent diabetes, hyperlipidemia, and hypertension, all of which could cause damage to the arteries of the brain, while noting the defendant was also previously diagnosed as having suffered a stroke.

*Id.* at ¶ 47. Before reaching a conclusion on Mr. Tipton's competency to proceed, Dr. Danziger believed that further neuropsychological testing was necessary to verify his initial impressions. *See id.* at ¶ 48.

Dr. Henley conducted such testing on March 27, 2023. *See* PSR, *Henley Report*. Dr. Henley's testing results indicated that "extremely low intellectual functioning with minimal variability, with a dramatic decline from 1991 [IQ] scores." *Id.* at 8. Dr. Henley hypothesized the basis for the decline in intellectual functioning included the Defendant's 20-year history of poorly controlled diabetes, his prior stroke, and his other vascular-related medical conditions. *Id.* at p. 8. Dr. Henley stated that the test results were "[s]trongly suggestive that Mr. Tipton has experienced a significant cognitive decline from prior levels of functioning. He exhibited impairments in every cognitive domain tested." *Id.* at

p. 8. Dr. Henley concluded that the defendant's presentation was consistent with a Major Vascular Neurocognitive Disorder, as well as generalized anxiety disorder with panic attacks and major depressive disorder by history. *Id.* at 8.

After completing his evaluation and reviewing Dr. Henley's Report, Dr. Danziger concurred in Dr. Henley's diagnosis that Mr. Tipton was suffering from a major vascular neurocognitive disorder. PSR, *Danziger Report* at ¶ 54. This cognitive disorder "significantly and adversely impact[ed] the defendant's memory, judgment, reasoning, and overall cognitive abilities." *Id.* Like Dr. Henley, Dr. Danziger noted Mr. Tipton's long history of suffering from, ADHD, major depressive disorder, and anxiety disorders. *Id.* at ¶ 55. Based on their reports, and without objection from the Government, the magistrate found that Mr. Tipton was incompetent to proceed. Doc. 90.

While Mr. Tipton's significant medical and mental health conditions do not excuse his offense, consideration of them is critical to the application of the other § 3553 factors in his case as discussed below.

## 2.    The Need for the Sentence Imposed

### A.    *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

The guidelines' demand for a life sentence is a harsh and unfair punishment. As previously stated, Mr. Tipton appreciates the seriousness of his offense. He also knows that he deserves a lengthy sentence of imprisonment for his actions. Nevertheless, this Court should consider the severe impact that a

lengthy prison sentence will have on Mr. Tipton due to his significant medical and mental health issues. *See* Section I, *supra*. Based on his significant medical condition, Mr. Tipton's incarceration will significantly reduce his life-expectancy. *See* Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, Am. J. of Public Health 103, no. 3 (March 1, 2013), at 523-528.  Dr. Patterson concludes that for every year served in prison, an individual's life expectancy is reduced by two years. *Id.*

Moreover, a long prison sentence will be especially harsh for Mr. Tipton based on his mental limitations. *See* Patricia Warth, Unjust Punishment: *The Impact of Incarceration on Mental Health*. NYSBA (Dec. 5, 2022); *see also* Paula M. Ditton, *Special Report: Mental Health and Treatment of Inmates and Probationers*, Bureau of Justice Statistics at 9 (July 1999), https://bjs.ojp.gov/content/pub/pdf/mhtip.pdf.

Such a result is inconsistent with the concept of just punishment. As Justice Anthony Kennedy observed, long sentences are "an ongoing injustice of great proportions," and those "long sentences have appalling effects on people's lives." Liz Mineo, Harvard Gazette*, Kennedy Assails Prison Shortcomings*, available at http://news.harvard.edu/gazette/story/2015/10/kennedy-assails-prison-shortcomings/.  Justice Kennedy has further stated, "[o]ur sentences are too long, our sentences are too severe, our sentences are too harsh . . . [and because there are so few pardons] there is no compassion in the system. There's no mercy in the system." *See Judicial Security and Independence*, Hearings

before the Senate Judiciary Comm., 110th Congress, (Feb. 14, 2007) (Testimony of Justice Anthony Kennedy).

While Justice Kennedy's statement provides important insight into the injustice of long prions sentences generally, the dangers identified by him pose an even greater risk in the instant case. Mr. Tipton is not only facing an exceedingly harsh sentence under the advisory guidelines (regardless of what they turn out to be), but also the injustice of a matrix which fails to contemplate his serious health conditions in calling for a sentence that will keep him behind bars for his remaining years. Such a result betrays the inherent irrationality of applying the advisory guidelines in the instant case, as well as that sentencing matrix's conflict with the § 3553 factor of just punishment.

   B.  *To afford adequate deterrence to criminal conduct*

The issue raised by this § 3553 factor is whether an advisory guideline prison sentence provides adequate deterrence to criminal conduct, or whether additional time as promoted by the sentencing guidelines is necessary to achieve this goal. The question then becomes whether greater prison time equates to greater deterrence.

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12,

2015), *available at* https://www.brennancenter.org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent." *Id.* at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 4. In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id.*; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

C. *To protect the public from further crimes of the defendant*

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section shows that the § 3553(a) factor of specific deterrence also supports Mr. Tipton's request for a variance. This section focuses on studies establishing that incarceration has no effect on recidivism.

1.     *The relationship between incarceration and recidivism*

As in the case of general deterrence, empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), hereto attached as Exhibit 5. Indeed, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. *See* Ex. 5 at 4; *see also* Vera Institute of Justice, *Overview of The Prison Paradox: More Incarceration         Will         Not         Make         Us         Safer* (July 2017) (concluding that research shows a "weak relationship between incarceration and crime reduction and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration").[1] Instead, a longer prison sentence may lead to a greater risk of recidivism. *See id*. There is strong evidence that prison, by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing

---

[1] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level" since "[t]he guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

less serious offenders to older more serious offenders, leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Ex. 5 at 4. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. Nat'l Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), *available at* https://doi.org/10.17226/1861.

Finally, the 2016 study concludes that community correction programs are more effective than incarceration in reducing recidivism. Ex. 5 at 5. Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections. Ex. 5 at 1, 4.

> D.    *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

A significant sentencing consideration in this case is whether Mr. Tipton will receive effective care in the BOP based on his health concerns. *See, e.g.,* § 3553(a)(2)(D) (stating that the sentence imposed must ensure that needed medical care is provided "in the most effective manner"). This factor reflects the

16

established legal tenet that prisons are required to provide medical care to their inmates. *See*, *e.g.*, *Estelle v, Gamble*, 429 U.S. 97 (1976). In *Estelle*, the Supreme Court maintained that the Eighth Amendment requires the government obligation to provide medical care for those whom it is punishing by incarceration.  429 U.S. at 103 (internal citations omitted).

Despite the requirements of the Eighth Amendment, the BOP consistently fails to meet the standard of adequate medical care for its inmates. And this failure has persisted over a significant period. An audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services. The Inspector General found that in numerous instances, the BOP failed to "provide required medical services to inmates," due to inadequate treatment for chronic conditions, failing to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failing to meet performance target levels on treatment of serious conditions. *See* U.S. Dep't of Justice, OIG, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care* ii-xix, 32-34 (2008), *available at* https://oig.justice.gov/reports/BOP/a0808/final.pdf.

Since that 2008 audit, things have not changed in the federal bureau of prisons. *See* American Ass'n. of Family Physicians, *Incarceration and Health: A Family Medicine Perspective* (July 2021) ("Inmates in correctional facilities have significantly higher rates of disease than the general population, and correctional facilities are often an ill-equipped provider for the medically underserved")

17

(citations omitted), available at https://www.aafp.org/about/policies/ all/incarceration.html; *see also* Meg Anderson, *Lawmakers push for federal prison oversight after reports of inadequate medical care*, NPR (Dec. 12, 2023), available at https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-.[2]

The Department of Justice Office of Inspector General recently issued another report in February 2024, concerning inmate deaths in the BOP from 2014 to 2021. *See* U.S. Dep't of Justice, OIG, *Report on Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions* (Feb. 15, 2024), attached hereto as Exhibit 6. The OIG again found deficiencies in the BOP's provision of health care to inmates in stating that "[w]e found significant shortcomings in BOP staff's emergency responses to nearly half of inmate deaths we reviewed." Ex. 6 at 1. *See also* Meg Anderson, *1 in 4 Inmate Deaths Happen in the Same Federal Prison. Why?* NPR (Sept. 23, 2023) (finding many serios illnesses went untreated at various BOP facilities until it was too late).

Against this backdrop, a variance is Mr. Tipton's requested sentence is warranted based on his need to receive effective medical treatment. Courts often recognize the importance of imposing sentences below the guidelines range in cases involving seriously infirm defendants such as Mr. Tipton. *See United States*

---

[2] A study of the BOP's response to COVID determined that its incompetence and indifference actually contributed to the spread of the virus. *See* Keri Blakinger and Keegan Hamilton, *"I Begged to Let Me Die": How Federal Prisons Became Coronavirus Death*, The Marshall Project (June 18, 2020).

*v. Martin*, 363 F.3d 25, 50 (1st Cir. 2004) (downward departure proper where "several serious medical conditions make Martin's health exceptionally fragile [and] ...we are not convinced that the BOP can adequately provide for Martin's medical needs during an extended prison term [and] there was a high probability" that lengthy incarceration would shorten the defendant's life span); *United States v. Gee,* 226 F.3d 885 (7th Cir. 2000) (sentencing court's downward departure under §5H1.4 based on defendant's health condition was not abuse of discretion and BOP letter stating that it could take care of any medical problem "was merely a form letter trumpeting [BOP] capability").

As both *Martin* and *Gee* indicate, entrusting the care of Mr. Tipton to the BOP is a risky proposition. The risk is particularly acute in Mr. Tipton's case because of his need for extensive and vigilant care for his numerous and at times life-threatening health conditions. Thus, the entrustment of the Defendant's significant medical care to the BOP, through a long sentence of imprisonment, is contrary to the principles of just sentencing as reflected in § 3553.

**3.    The Guideline Sentencing Range Established**

A critical question in Mr. Tipton's case is the exact weight this Court should give to the guidelines. As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49, 128 S. Ct. at 597; *see also Rita*, 551 U.S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). In certain cases, the Guidelines may have little persuasive force in light of some of the other

§ 3553(a) factors. *United States v. Glover*, 431 F.3d 744, 752-53 (11th Cir. 2005), *abrogated on other grounds*, *United States v. Joseph,* 371 Fed.Appx. 70 (11th Cir. 2010) (unpublished). Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.

A troubling aspect of Mr. Tipton's case is that the severe penalties he now faces are predicated on a guideline range that is not the product of reasoned judgment or of a deliberative process. *See United States v. Johnson*, 588 F.Supp.2d 997, 1003 (S.D. Iowa 2008) (concluding that the sentencing guidelines for child pornography crimes "do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses."); Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (January 1, 2009); *see also United States v. Riley*, 655 F.Supp.2d 1298, 1300-04 (S.D.Fla. 2009) (citing Stabenow article and other case law in imposing 60-month sentence in transporting child pornography case, rather than recommended Sentencing Guidelines range of 210 to 260 months and finding that § 2G2.2 did not exemplify the Sentencing Commission's characteristic institutional role of careful study and empirical analysis); *United States v. Hanson,* 561 F.Supp.2d 1004, 1009-11 (E.D. Wis. 2008) (citing Stabenow article and other case law in imposing a 72-month sentence, rather than recommended Sentencing Guidelines

range of 210 to 260 months in transporting and possession of child pornography prosecution, and finding that § 2G2.2 did not exemplify the Sentencing Commission's characteristic role of empirical study).

In Mr. Tipton's case, his total guideline offense level has been substantially increased by his conviction for the distribution of child pornography under USSG §2G2.2. *See* PSR at ¶¶ 72-82 (calculating an offense level of 45). The PSR adds 13 levels under § 2G2.2 for: 1) prepubescent images; 2) sadomasochistic images; 3) the use of a computer; and 4) 600 images or more. *See PSR* at ¶¶ 73; 75; 77 and 78. Thus, Section §2G2.2 arrives at its draconian result by applying enhancements that apply in most cases. *See* USSC, Federal Sentences of Child Pornography (June 29, 2021), According to the sentencing commission, 99.4% of cases involve prepubescent images. The sentencing commission has further found that the use-of-the-computer enhancement and images of victims under 12 applies in 95% of all cases.[3] Furthermore, sadomasochistic images are found in 84% of the cases. Finally, 77.2% of cases involve over 600 images.

A 13-level increase in Mr. Tipton's guideline level is especially troubling since the severe penalties of the child pornography guideline are not the product of careful study, empirical evidence or simple logic. *See* Federal Sentencing

---

[3] Regarding the logic of the 2-level enhancement for use of the computer, one judge noted [a]s widespread as computer use is now, enhancing for use of a computer is a little like penalizing speeding but then adding an extra penalty if a car is involved." Federal Sentencing Practices Operation of the Federal Sentencing Guidelines: Reg'l Hearing Before the U.S. Sent'g Comm'n, at 5 (Nov. 2009) (statement of Robin J. Cauthron, Judge, W.D. Okla.), *available at* http://www.ussc.gov/AGENDAS/ 20091119/Cauthron.pdf.

Practices and the Operation of the Federal Sentencing Guidelines: Reg'l Hearing Before the U.S. Sent'g Comm'n, at 2 (Feb. 2009) (statement of Gregory A. Presnell, Dist. Judge, M.D. Fla.) (stating that federal courts afford less deference to the child pornography guidelines because they are "inherently illogical" and "not based on any empirical data or institutional analysis."), *available at* http://www.ussc.gov/AGENDAS/20090210/Presnell_statement.pdf.   And such a draconian result does not promote respect for the law or constitute just punishment. Indeed, justice should not be predicated on absurdities.

Moreover, a strict application of the advisory guideline range in Mr. Tipton's case will result in a sentence that is particularly harsh based on his severely compromised health and mental illness. Such a result demonstrates that the imposition of the guideline sentence in the instant case violates the parsimony clause of § 3553.  *See*, *e.g.*, *Kimbrough v. United States,* 552 U.S. 85 (2007) (district court's below guideline sentence in drug case not unreasonable because "it appropriately framed its final determination in line with §3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary to accomplish the goals" of sentencing"). *United States v. Johnson,* 635 F.3d 983, 988 (7th Cir. 2011) (noting that "to ensure that the court avoided a simple presumption that a within-Guidelines sentence was reasonable, we also must be able to infer that the court, in exercising its discretion, determined that the sentence conformed with the parsimony principle of § 3553(a)" and considered the individual circumstances of the Defendant's case).

Nevertheless, the advisory guidelines do provide some relief for medically challenged individuals such as Mr. Tipton. In considering a request for a variance, it is important to note that the guidelines specifically permit guideline departures based on physical impairment. *See* USSG § 5H1.4. This guideline specifically provides that "an extraordinary physical impairment may be a reason to impose a sentence below the guideline range, e.g., in the case of a seriously infirm defendant, *home detention may be as efficient as, and less costly than, imprisonment.*" *Id.*

It is important to note, however, that § 5H14 does not preclude the imposition of a shorter prison sentence based on physical impairment.  *See also United States v. Ghannam*, 899 F.2d 327, 329 (4th Cir. 1990) (extraordinary medical impairment under §5H1.4 does not preclude the possibility that impairment might also warrant a shorter sentence rather than an alternative to Imprisonment).  Mr. Tipton's medical conditions are significant and pervasive, and it seems apparent that the BOP will be unable to address them adequately. Thus, a departure under §5H1.4 is necessary to a just result in this case.

Furthermore, the guidelines recognize that a defendant's impaired mental condition can support a departure under USSG §5H1.3. Section 5H1.3 states that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.4.

The record clearly establishes that Mr. Tipton suffers from significant mental health problems and cognitive impairment. PSR at ¶¶ 117-121. Moreover, Mr. Tipton's impairment began at an early age and persisted throughout his life. Based on his educational and social security records, as well as the evaluations conducted by a neuropsychologist (Dr. Henly) and a psychiatrist (Dr. Danziger), it is evident that Mr. Tipton is mentally and cognitively impaired.  While the PSR states that the government's expert, Dr. Otto, found indications of malingering and recommended the Court not adjudicate him incompetent, Dr. Otto further stated that he could not provide a more definitive opinion. *See* PSR at ¶ 122; *see also Order on Competency*, Doc. 90 at 2.  Based on the record presented to the lower court, it found that Mr. Tipton was incompetent to proceed based on a mental disease or defect under 18 U.S.C. § 4241.[4] In reaching its decision, the court noted that the Government stipulated such a finding. *Id*. at 2.

## <u>CONCLUSION</u>

As the foregoing establishes, the unique circumstances presented in Mr. Tipton's case warrant a variance below the applicable guideline range. Because

---

[4] 18 U.S.C. § 4241(a) states:

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, Mr. Tipton respectfully submits that a variance is appropriate pursuant to this significant sentencing statute.

Respectfully submitted,

*/s/ Fritz Scheller*
Fritz Scheller
Florida Bar No. 183113

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 8, 2024, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar No. 0183113
Fritz Scheller, P.L.
200 E. Robinson St., Ste. 1150
Orlando, Florida 32801
PH:   (407) 792-1285
FAX: (407) 649-1657
Email: fscheller@flusalaw.com
